The TOILET GOODS ASSOCIATION,
INC., et al., Plaintiffs,

v.

Anthony J. CELEBREZZE, Secretary of
Health, Education and Welfare, and
George P. Larrick, Commissioner of
Food and Drugs, Defendants.

United States District Court
S. D. New York.
Nov. 16, 1964.

Breed, Abbott & Morgan, New York City, for plaintiffs, William L. Hanaway, Edward J. Ross, and Stephen R. Lang, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for defendants, by Arthur S. Olick and Patricia A. Garfinkel, Asst. U. S. Attys., and William W. Goodrich, Asst. Gen. Counsel, for Food & Drugs, and William R. Pendergast, Atty., U. S. Dept. of Health, Education & Welfare.

TYLER, District Judge.

Forty individuals and companies manufacturing, distributing, and selling cosmetics in interstate commerce and an association of cosmetic manufacturers here seek a declaratory judgment [28 U.S.C. § 2201] as to the validity of certain provisions of regulations promulgated by the Commissioner of the Food and Drug Administration (FDA). These regulations were issued pursuant to the 1960 Color Additives Amendments to the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–381.[1] More specifically, plaintiffs contend that the challenged regulations exceed the authority vested in the FDA by the statute, as amended,

1. The Amendments were enacted on July 12, 1960.

and pray that the court declare the regulations null and void and enjoin their enforcement.

Essentially, the 1960 Amendments expand the Act's provisions for the pretesting of coal tar colors to require the pretesting of all color additives, irrespective of their derivation. To this end, the term "color additive" is defined as "a dye, pigment, or other substance" which, "when added or applied to a food, drug, or cosmetic, or to the human body or any part thereof, is capable * * * of imparting color thereto." 21 U.S.C. § 321(t) (1). The Amendments further state that color additives shall be deemed "unsafe" within the meaning of the Act unless they conform to regulations for the listing of additives and for "the certification, with safe diluents or without diluents, of batches of color additives." 21 U.S.C. § 376.

To implement these Amendments, the Commissioner of the FDA issued the Color Additives Regulations, dated June 13, 1963.[2] 28 F.R. 6439, 21 C.F.R. §§ 8.1–8.6003. Those provisions of the regulations here challenged as in excess of the statutory authority on which they purport to be based are:

(a) provisions of Section 8.1(f) which, it is claimed, may have the effect of defining a color additive as including finished cosmetic products, and consequently, of requiring the pretesting of finished products;

(b) provisions of Sections 8.1(f) and (m) which define color additives as including all diluents and which, plaintiffs claim, may require the pretesting, listing and certification of all ingredients of cosmetics containing a color additive mixture;

(c) provisions of Section 8.1(f) and (u) which are claimed to make nugatory the statutory exemption for hair dyes, 21 U.S.C. § 361(a) and (e); and

(d) provisions of Section 8.28(a) (4) which plaintiffs contend is an unwarranted grant of access by FDA investigators to all processes and formulae involved in the manufacture of cosmetics.

Defendants have moved for an order dismissing the complaint, and, alternatively, for an order "striking certain portions of the complaint." [3]

### I.

Defendants' principal contention on their motion to dismiss is that the complaint fails to state a case of actual controversy, as required by the Declaratory Judgment Act, 28 U.S.C. § 2201, particularly because of the absence of any threatened or attempted enforcement of the regulations.

Although the Declaratory Judgment Act was never intended or construed to grant the federal courts license to render advisory opinions, threatened enforcement of a statute or administrative regulation is not a *sine qua non* for its review under the Act. See Borchard, Declaratory Judgments (2d ed., pp. 365–6). In Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 417–418, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942), FCC regulations provided that radio stations would have their licenses revoked if they entered into contracts with networks containing certain prohibited clauses. The court held the regulations to be reviewable because of their serious impact upon the radio network's ability to conduct its business and stated that, "If an administrative order has that effect it is reviewable and it does not cease to be so merely because it is not certain whether the Commission will institute proceedings to enforce the penalty incurred under its regulations for non-compliance."

Recently, in Abbott Laboratories v. Celebrezze, 228 F.Supp. 855 (D.Del. 1964), where drug manufacturers chal-

---

2. Actually, 21 U.S.C. § 371(a) vests in the Secretary of the Department of Health, Education and Welfare the authority to promulgate Food & Drug Act regulations. Defendants' memoranda explain that the responsibility for their actual promulgation was delegated to the Commissioner.

3. Defendants, however, have not specified which portions they wish stricken.

lenged FDA labeling regulations, Chief Judge Wright held, at page 861:

"Plaintiffs may have judicial review of interpretive regulations upon their promulgation without awaiting some ultimate enforcement. Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956); Federal Trade Commission v. Nash-Finch Company, 110 U.S.App.D.C. 5, 288 F.2d 407. They need not await an action which would only make the threat of harm more pressing."

■ Thus, while the threat of enforcement is often present in cases where the courts have taken jurisdiction and rendered a declaratory judgment on the validity of a challenged regulation or statute, the existence of such a threat merely serves as some evidence indicating the presence of an actual controversy and that the plaintiff stands to suffer "real, immediate and incalculable" harm. See concurring opinion of Mr. Justice Douglas, Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 175, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

In Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1940), the Supreme Court said that, "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

■ More specifically, as to the reviewability of administrative rulings, Chief Justice Stone said in Columbia Broadcasting System, Inc. v. United States, supra, 316 U.S. at page 425, 62 S.Ct. at page 1204:

"The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control."

This being the test, I find it difficult and indeed inappropriate, at least under the circumstances here presented, to resolve the issue of reviewability upon the technical distinction, pressed by defendants, between legislative and interpretive regulations. Parenthetically, I should add that I read no federal authority to precisely support the defendants' argument that the regulations here involved are "interpretive" as opposed to "legislative" and thus do not "approach a degree of finality such as would warrant access to the Courts". (See page 59 et seq. of the government's principal brief.) [4]

In any event, for reasons to be discussed hereinafter, I conclude that in a substantial and practical business sense plaintiffs are threatened with irreparable injury by the obviously intended consequences of the challenged regulations, and that to resort to later piecemeal resolution of the controversy in the context of individual enforcement proceedings would be costly and inefficient, not only for the plaintiffs but as well for the public as represented by the defendants.

■ The regulations force manufacturers to choose between complying with them, at a cost that may prove to be prohibitive for some of the plaintiffs, or ignoring them at the risk of incurring the statutory penalties should the regulations later be held valid. And, as Chief Judge Wright recently observed in the Abbott Laboratories case, supra, 228 F.Supp. at 862: "The declaratory judgment procedure is specifically suited for the determination of controversies where the plaintiffs must either comply

---

4. In fairness to defendants, however, it must be said that some commentators and courts have discussed this distinction in theoretical terms. See Davis, Administrative Rules—Interpretative, Legislative and Retroactive, and cases therein cited. 57 Yale L.J. 919, 928–29 (1948).

with a contested regulation or continue their present course of conduct at their peril."

■ An affidavit submitted on behalf of one of the plaintiffs asserts that the cost of compliance to this plaintiff alone will be over $50,000,000. While this amount is immediately suspect,[5] there can be little doubt but that the added recordskeeping and laboratory testing costs in themselves will be extremely burdensome for all of the plaintiffs.

Aside from such measurable out-of-pocket costs of compliance, it is not difficult to perceive that the impact of the regulations on plaintiffs' present methods of doing business will be substantial and will give rise almost certainly to potentially greater expenses. That the latter are "hidden expenses" in the sense that they are presently incalculable does not diminish their significance. For example, in the area of research alone, plaintiffs' affidavits show that the provisions of the regulations dealing with listing and with access to all formulae and processes will have an immediate adverse effect upon further research and development of new products. The situation here, incidentally, contrasts sharply with the facts of Helco Products Co. v. McNutt, 78 U.S.App.D.C. 71, 137 F.2d 681, 149 A.L.R. 345 (1943), where the plaintiff sought a declaratory judgment on the validity of a simple advisory opinion of the FDA elicited in response to the plaintiff's inquiry whether or not its proposed business venture would violate the Food and Drug Act. Rather, we are dealing with a case that more closely parallels Wallace v. Currin, 95 F.2d 856 (4th Cir. 1938), aff'd., 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939). The court in that case held that the plaintiffs, tobacco warehousemen, could challenge the 1955 Tobacco Inspection Act in a declaratory judgment suit because of the Act's substantial interference with their businesses, notwithstanding the fact that the

cost of compliance for each warehouseman would only be $25 per marketing season.

■ Having established that a justiciable controversy exists, there are at least two compelling reasons for assuming jurisdiction and determining in this action the validity of the challenged regulations.

First, since a concern for consumer safety is ostensibly the principal motive underlying promulgation of the Color Additives Regulations, there is a strong public interest in an early determination of their validity. Four years have already elapsed since Congress enacted the statutory provisions which the regulations seek to implement. Any further delay in determining whether or not the cosmetic industry need comply with the regulations will only serve to further frustrate Congress' purpose of providing the consuming public with protection against potentially harmful color additives.

Second, this action provides an opportunity to examine all four challenged regulatory provisions together within the context of a single plenary proceeding. Since these four provisions are interrelated as elements of a common plan of governmental regulation, there is a distinct advantage in reviewing them together. Moreover, since the regulations raise complicated and technical issues which will require expert testimony to resolve—undoubtedly from many of the same witnesses—there is a practical advantage for the litigants as well as for the court in having this testimony brought forth in a single action rather than in four or more separate suits or enforcement proceedings.

II.

Since I conclude that there is a justiciable controversy presented and further that it would be improvident to decline jurisdiction on discretionary grounds,

---

5. The affiant apparently confused § 8.50(c) of the regulations, which requires a *deposit* of $2,600 for each listing application, with § 8.50(j), which establishes a *fee* of $250 "for services in listing a diluent" for use in color additive mixtures.

this would dispose of the dismissal motion were it not for the fact that defendants raise two further arguments for dismissal of the entire action and two other arguments for dismissal as to certain of the plaintiffs. All four issues so raised must be resolved against defendants, at least at this stage of the proceedings:

■ (1) This is not an unconsented suit against the United States. Keeping in mind the distinction drawn in Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), the thrust of the claim here is not that the Commissioner wrongly exercised his delegated powers —which would be a claim against the sovereign—but that he acted in excess of his statutory authority and therefore outside the scope of his delegated powers. And, as the Supreme Court said in Larson, at 689, 69 S.Ct. at 1461, "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." See Abbott Laboratories v. Celebrezze, supra; Philadelphia Company v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912); Federal Trade Commission v. Nash-Finch Company, 110 U.S.App.D.C. 5, 288 F.2d 407 (1961).

■ (2) The Attorney General is not an indispensable party to this action. This was the conclusion in the Abbott Laboratories case where the court said 228 F.Supp. at page 862: "The decree sought here does not operate against the Attorney General except in a secondary fashion. He will not be forced to do anything no matter how the court decides."

■ (3) The Toilet Goods Association does have standing to sue. The members of the Association account for more than 90% of the annual sales of cosmetics in the United States. They are individually harmed and the Association, as a proper representative of the interests of its members, can challenge the regulations in that capacity. National Motor Freight Traffic Association v. United States, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963); Abbott Laboratories v. Celebrezze, supra.

■ (4) Venue, predicated upon 28 U.S.C. § 1391(c), is proper as to each of the individually named plaintiffs. Although not all the Circuits agree, this Circuit has consistently held that 28 U.S.C. § 1391(c) applies to plaintiff and defendant corporations alike. Freiday v. Cowdin, 83 F.Supp. 516 (S.D.N.Y. 1949); Southern Paperboard Corporation v. United States, 127 F.Supp. 649 (S.D.N.Y.1955); Wear-Ever Aluminum Inc. v. Sipos, 184 F.Supp. 364 (S.D.N.Y. 1960).

Accordingly, defendants' motion to dismiss is denied in all respects.

### III.

■ Since the papers already submitted by the parties raise substantive issues outside this court's ordinary sphere of competence, it would be unwise to make a determination on the merits at this stage without the aid of "live", expert testimony.

To be sure, the essential questions presented in this action are ones of statutory interpretation; whatever competence the court and counsel may have in this area generally, however, can only be enhanced by a particular understanding, to be obtained with expert assistance, of the technical problems involved. Additionally, since professionally qualified representatives of both plaintiffs and defendants were present during the hearings and debates which preceded the passage of the 1960 Color Additives Amendments, it would be helpful to hear their testimony relative to legislative intent, which, presumably, they had an important role in shaping and assisting.

Plaintiffs' motion for summary judgment, therefore is denied.

### IV.

■ Inasmuch as defendants have not specified what they wish to have stricken from the complaint, their motion to strike is denied.

Settle order accordingly.