**CAPROCK PLAINS FEDERAL BANK ASS'N, et al., Plaintiffs–Appellees,**

**and**

**Federal Land Bank of Texas and Federal Intermediate Credit Bank of Texas, Intervening Plaintiffs–Appellees,**

**v.**

**FARM CREDIT ADMINISTRATION, Defendant–Appellant.**

**No. 87–1326.**

United States Court of Appeals, Fifth Circuit.

May 2, 1988.

---

Jerry N. Smith, Alan B. Jones, H.A. Berry, Underwood, Wilson, Berry, Stein & Johnson, Amarillo, Tex., Crenshaw, Dupree & Milam, Lubbock, Tex., for Caprock Plains Federal Bank Ass'n.

William E. Zimmerman, Austin, Tex., Ky P. Ewing, Jr., Christopher T. Corson, Robert J. Casey, Washington, D.C., Charles T. Newton, Jr., Houston, Tex., for Federal Land Bank of Texas, et al.

Before KING and DAVIS, Circuit Judges, and FELDMAN *, District Judge.

W. EUGENE DAVIS, Circuit Judge:

Appellant, Farm Credit Administration (FCA), appeals from a judgment invalidating, and enjoining enforcement of, an FCA regulation authorizing the FCA to compel financially sound Farm Credit System (System) institutions to provide funds to unsound System institutions. Because the regulation is not ripe for judicial review, we vacate the judgment of the district court.

### I.

#### A.

The Farm Credit System (System) is a congressionally established network of federally chartered, privately held cooperative lending institutions. The System is divided into twelve Farm Credit Districts. Each district has a Federal Intermediate Credit Bank (FICB), which makes short and intermediate term loans to Production Credit Associations (PCAs). PCAs in turn lend money directly to farmers, ranchers, and fishermen. Each district also has a Federal Land Bank (FLB), which makes long-term agricultural and rural housing loans through Federal Land Bank Associations (FLBAs) in its district.

System borrowers directly or indirectly own each of the System institutions just described. To obtain a loan, borrowers must agree to invest up to ten percent of their loan proceeds in equity shares of the

Mark B. Stern, Robert S. Greenspan, Attys., Dept. of Justice, Civ. Div., Appellate Staff, Washington, D.C., for defendant-appellant.

* District Judge of the Eastern District of Louisiana, sitting by designation.

lender or loan originating institution. Borrowers redeem these equity shares upon repayment of their loans.

A severe, protracted depression in the nation's agricultural economy imposed staggering losses on the System. *See* H.R. Rep. No. 425, 99th Cong., 1st Sess. 6–7 (1985), *reprinted in* 1985 U.S.Code Cong. & Ad.News 2587, 2591–92. These losses reduced the value of System securities and led to fears that investor flight might cause further reduction in the value of System securities. In response, both Congress and the FCA acted to shore up the System and to restore investor confidence.

In September 1985, the FCA promulgated a regulation intended to aid financially unsound member institutions. *See* 12 C.F.R. § 611.1130. Section 611.1130 authorized the FCA in certain circumstances to compel financially sound System institutions to transfer assets to troubled System institutions.[1]

In December 1985, Congress enacted the Farm Credit Amendments Act of 1985, Pub.L. No. 99–205, 99 Stat. 1678, codified at 12 U.S.C. §§ 2001, et seq. (hereinafter 1985 Amendments). One part of the amended Act directed the FCA to charter a new entity, the Farm Credit System Capital Corporation (Capital Corporation). The Capital Corporation was authorized to perform essentially the same function the FCA was empowered to perform by § 611.1130. Upon the Capital Corporation's order, the Act required financially sound System institutions to transfer funds to the Capital Corporation which, in turn, could use the funds to assist troubled institutions. *See* 12 U.S.C. § 2216f(a)(14) (repealed 1988). The circumstances in which the Capital Corporation was authorized to act were, however, more limited than those in which the FCA may act under § 611.1130.

In 1987, Congress again amended the Farm Credit Act. *See* Pub.L. No. 100–233, 101 Stat. 1568 (hereinafter 1987 Amendments). The 1987 Amendments repealed much of the 1985 amendments. Among oth-

---

1. Section 611.1130 was originally codified at 12 C.F.R. § 611.1145. It is now codified, with minor changes, at 12 C.F.R. § 611.1130. Section 611.1130 provides in pertinent part:

    (b) The FCA may direct a transfer of funds or equities by one or more banks of the System to another bank of the System where it determines that:

    (1) The receiving institution will not be able to make payments of principal or interest on bonds for which it is primarily liable within the meaning of section 4.4.(a) of the Act; or

    (2) The common or preferred stock, participation certificates, or allocated equities of the receiving institution have a book value less than their par or stated values; or

    (3) The total bonds outstanding for which the receiving institution is primarily liable exceed 20 times the combined capital and surplus accounts of the bank; or

    (4) Based on application to it of one or more of the following ratios, the receiving institution is not financially viable in that it will not be able to continue to extend new or additional credit or financial assistance to its eligible borrowers:

    (i) The ratio of stock to earned net worth (including legal reserve, unallocated and reserved surplus, undistributed earnings, and allowance for losses) exceeds 2 to 1;

    (ii) The ratio of the outstanding bonds to capital and surplus exceeds 15 to 1;

    (iii) Nonearning assets (any noninterest-bearing assets, including but not limited to cash, nonaccrual loans, net fixed assets, acquired property, accrued interest receivable, and accounts receivable) exceed 15 percent of total assets;

    (iv) Lendable net worth (interest-earning assets less interest-bearing liabilities) is zero or less.

    (c) The FCA may direct a transfer of funds or equities between two or more Federal land bank associations or two or more production credit associations in a district where it determines that such transfer:

    (1) Is necessary to provide financial support to the district bank in which those associations are stockholders based on application of the criteria to the bank as set forth in paragraph (b) of this section; or

    (2) Is necessary to provide financial support to one or more other like associations in the district based on application of the criteria set forth in paragraphs (b)(2) or (b)(4) of this section to the associations, provided that in applying paragraph (b)(4)(ii) of this section the ratio of outstanding indebtedness to capital and surplus of the receiving association(s) shall not exceed 9 to 1; or

    (3) It is an integral part of a plan that has been adopted by other institutions of the System, and approved by the FCA, under which those institutions will extend financial assistance to the district bank in which those associations are stockholders.

er things, the 1987 Amendments revoked the charter of the Capital Corporation and replaced it with the Farm Credit Assistance Board (Assistance Board). The Financial Assistance Corporation, a federally chartered System institution, is authorized to issue 2.8 billion dollars in bonds, subject to the approval of the Assistance Board, to raise funds to assist qualified troubled institutions.[2] Section 6.4(a) of the 1987 Amendments provides that if the book value of a System institution's shares is less than their par value, the institution may request financial assistance from the Assistance Board.

### B.

Appellees are solvent member institutions of the Tenth Farm Credit District, which comprises the State of Texas. They alleged that a number of system institutions were in financial trouble. Appellees argued that § 611.1130 authorized the FCA to seize, without notice, funds belonging to them and transfer those funds to the troubled institutions. In support of their application for injunctive relief, appellees asserted that they were afraid FCA would transfer their funds to the unsound members and that the poor financial condition of the recipient institutions made it unlikely that the forced loans could be repaid.

The district court, following a hearing, temporarily enjoined the FCA from compelling a transfer of appellee's funds under § 611.1130. The court subsequently declared § 611.1130 invalid and permanently enjoined its enforcement. The district court concluded that the controversy was ripe for adjudication because postponing

review threatened plaintiffs with irremediable harm. The district court reasoned that if the FCA decided to compel a transfer of plaintiffs' funds, those funds might be taken without notice and with no assurance that plaintiffs could ever retrieve them. The court then held that FCA was without authority to compel a transfer of funds from one institution to another.

On appeal, the FCA again contends that: (1) the validity of the challenged regulation is not ripe for judicial review; and (2) the challenged regulation is within the agency's authority to promulgate regulations necessary and appropriate for carrying out the purposes of the governing statute.

### II.

### A.

We turn first to plaintiffs' argument that § 611.1130 is ripe for review because the regulation authorizes the FCA to transfer their funds without notice to financially unsound institutions. Appellees assert that they may not be able to recover these funds and argue that because of this they are threatened with irremediable future injury.[3] The FCA contends that plaintiffs' allegations of threatened injury are speculative. The FCA points out several contingencies that stand in the way of a compelled transfer of funds. The main contingency FCA lists is that it may never order a transfer of funds under § 611.1130. The FCA further contends that even if it directs a transfer of funds to a troubled institution, FCA's authority to order the transfer could be reviewed by a court at that time; the court could vacate the transfer or order

2. The Assistance Board has already agreed to provide aid to at least one troubled bank. On February 29, the Assistance Board announced that the Federal Land Bank of Jackson, Mississippi would receive $25 million in assistance. *See* L.A. Times, March 1, 1988, § 4, at 6, col. 4.

3. Plaintiffs also argue on appeal that § 611.1130 has a direct and immediate impact on them because it has encouraged borrowers to leave the System. Appellees argue that this has occurred because borrowers fear the FCA will take funds from their solvent lending institutions and impair the value of the borrowers' equity

shares in those lending institutions. They argue that borrowers who are able to do so find credit elsewhere, pay off their loans, and redeem their equity shares at full value. The FCA argues that § 611.1130 contributes to the soundness of the system as a whole and therefore increases investor confidence and deters borrower flight. The record is completely silent on this issue, which undoubtedly explains why the district court did not address it. The plaintiffs-appellees had the burden of proof on this issue and their failure to adduce any proof in support of their contention prevents us from considering the argument.

the transferee institution to refund the payment.

## B.

In considering whether issues are ripe for judicial resolution, we must evaluate the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Four criteria are relevant to this determination:

(1) Whether the issues presented are purely legal;

(2) whether the challenged agency action constitutes 'final agency action' ...;

(3) whether the challenged agency action has or will have a direct and immediate impact on the petitioner; and

(4) whether resolution of the issues will foster, rather than impede, effective enforcement and administration by the agency.

*Texas v. United States Dept. of Energy*, 764 F.2d 278 (5th Cir.), *cert. denied*, 474 U.S. 1008, 106 S.Ct. 531, 88 L.Ed.2d 463 (1985). The only question presented by this appeal is whether the impact of § 611.1130 on plaintiffs "is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Laboratories*, 387 U.S. at 152, 87 S.Ct. at 1517; *see also Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967).

In *Abbott*, the plaintiff sought to enjoin enforcement of a Food and Drug Administration (FDA) regulation requiring manufacturers of prescription drugs to label their products with an "established name" designated by the Secretary of Health, Education and Welfare. Compliance with the regulation required manufacturers to change their existing labels, advertisements, and promotional materials; this required them to destroy stocks of printed material and to invest heavily in new printing type and new supplies. If a manufacturer chose not to comply with the regulation it risked criminal and civil penalties for noncompliance, including seizure of its products and injunction against sale. The Supreme Court held that the regulation "require[d] an immediate and significant change in ... conduct ... with serious penalties attached to non-compliance." *Id.* at 153, 87 S.Ct. at 1518. "The impact of the regulations upon the petitioners [was] sufficiently direct and immediate as to render the issue appropriate for judicial review." *Id.* at 152, 87 S.Ct. at 1517. The Court reasoned that the *Abbott* plaintiffs faced precisely the kind of dilemma that declaratory relief was designed to ameliorate.

In *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), a companion case to *Abbott Laboratories*, the plaintiff challenged an FDA regulation that required manufacturers to give FDA employees "free access" to facilities involved in manufacturing color additives. *Id.* at 161, 87 S.Ct. at 1523. If a manufacturer denied an FDA employee free access to its facilities, FDA could deny certification to the manufacturer's products and prohibit their sale. The regulation was not, however, self-executing; it stated that the commissioner of the FDC *may* authorize inspectors to examine manufacturing facilities. The Court held that the regulation was not ripe for review. Postponing review would not impose any undue hardship on the parties because "no irremediable adverse consequences flow from requiring a later challenge to this regulation by a manufacturer who refuses to allow this type of inspection." *Id.* at 164–65, 87 S.Ct. at 1525. The Court recognized that FDA denial of product certification might cause "inconvenience and possibly hardship" to the plaintiff, depending on such factors as the quantity of products denied certification and the time required to litigate the validity of the regulation. Nevertheless, the Court found this possibility speculative and an insufficient threat of harm to make the claimed invalidity of the regulation ripe for judicial review. *Id.* at 165 n. 2, 87 S.Ct. at 1525, n. 2.

In *Thomas v. Union Carbide Agric'l Prods. Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), the Supreme Court found

ripe for review the validity of a compensation and arbitration procedure established by the Federal Insecticide and Fungicide and Rodenticide Act (FIFRA). FIFRA requires pesticide manufacturers to register their products prior to sale. To qualify for registration, manufacturers must submit to the Environmental Protection Agency (EPA) health and safety data concerning their products. Later registrants of a similar product may use the data filed by earlier registrants. FIFRA establishes a compensation scheme to reimburse an early registrant for the value of the shared data. The compensation scheme requires manufacturers to negotiate the value of the shared data, and if negotiations fail to result in an agreement manufacturers must submit value disputes to arbitration.

A group of chemical manufacturers challenged the mandatory arbitration provisions of FIFRA on the ground that the arbitration requirement violated article III of the Constitution by vesting judicial power in a non-article III body, with only limited review by article III judges. Initially, the Supreme Court held that the challenge to FIFRA was not ripe for review because the manufacturers had neither alleged nor established an injury resulting from the compelled arbitration provisions of the statute. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019–20, 104 S.Ct. 2862, 2881–82, 81 L.Ed.2d 815 (1984). The Court concluded that the challengers constitutional claims would not be ripe for adjudication until data had been shared and an arbitrator had made an award. *See id.*

On remand, the challengers amended their complaint to allege that their data had been used and that an arbitration award failed adequately to compensate them for the value of the data. *See Union Carbide,* 473 U.S. at 579, 105 S.Ct. at 3332. The Supreme Court then held that the manufacturers' article III claim was ripe for review because each claimant had been or inevitably would be subjected to an exercise of allegedly unconstitutional jurisdiction. *Id.* at 580, 105 S.Ct. at 3332–33. The Court contrasted the amended complaint with the original lawsuit, in which the alleged harm involved " 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Id.* at 581, 105 S.Ct. at 3333 (quoting 13A C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3532 (1984)).

In *Texas v. United States Dept. of Energy,* the State of Texas and some of its citizens sought review of the Secretary of Energy's designation of two Texas sites as potentially acceptable for nuclear waste repositories. We dismissed the petition as unripe and held that requiring petitioners to pursue further agency review of the initial decision did not impose the direct and immediate impact necessary to create ripeness. *Id.* at 284. We also rejected the private petitioners' contention that the Secretary's decision was ripe for review because it reduced land values; we concluded that the reduction in land values may have been only temporary because the decision was not final.

■ The D.C. Circuit has explained that the *Abbott Laboratories* test requires a court to weigh the institutional interests in postponing review against the parties' interest in prompt resolution of their dispute. *See State Farm Mutual Auto Ins. Co. v. Dole,* 802 F.2d 474, 479 (D.C.Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1616, 94 L.Ed.2d 800. Among the institutional interests is the goal of avoiding unnecessary adjudication. *Id.* Thus, "a party's allegation of hardship will be found wanting if there are too many 'ifs' in the asserted causal chain linking the agency's action to the alleged hardship...." *Id.* at 480; *see also Alascom Inc. v. Federal Communications Comm'n,* 727 F.2d 1212 (D.C.Cir. 1984) ("the mere *potential* for future injury, however, is insufficient to render an issue ripe for review").

■ Applying the principles announced in the above cases to the facts of our case, we are persuaded that plaintiffs' challenge to § 611.1130 is not ripe for review. Appellees failed to adduce proof that they are

likely to be harmed by postponing review. Instead, appellees' fear of impending harm is based on " 'contingent future events that may not occur as anticipated....' " *Union Carbide,* 473 U.S. at 581, 105 S.Ct. at 3333 (quoting 13A C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3532 (1984)).

We are driven to this conclusion for two reasons. First, appellees suggest no reason the FCA would invoke the transfer provisions of § 611.1130 instead of relying on the financial assistance mechanisms provided by the 1987 Amendments.

We find nothing in the 1987 Amendments that requires the FCA to prefer them over its own regulation. Nevertheless, if the 1987 Amendments are sufficient to meet the needs of the System, there are good reasons why the FCA would prefer to see a troubled institution receive aid from the Assistance Board, as authorized by the 1987 Amendments, rather than receive aid as authorized by § 611.1130. When the Assistance Board provides aid, it injects new funds generated from the sale of bonds into the System. If new capital is available, it is unlikely that the FCA would apply § 611.1130 and transfer funds from a sound institution to an unsound one and thereby weaken one institution to help another. Although § 611.1130 may conceivably provide a preferable alternative to the assistance available under the 1987 Amendments in certain limited circumstances, the possibility that such a circumstance would arise is speculative.

Second, appellees' allegation of irremediable harm is further undermined by their failure to demonstrate that they will be unable to obtain effective judicial relief after a transfer of funds is ordered. Appellees' assumption that a receiving institution will dissipate the funds before a court could enter a temporary restraining order that would protect the status quo of the parties is highly speculative.

Because § 611.1130 has not had and may not have a direct and immediate impact on plaintiffs, the controversy is not ripe for judicial review. Accordingly, we vacate the judgment of the district court and re-mand this case to the district court for a dismissal of this action without prejudice.

VACATED and REMANDED.